RICHARD A. SCHELL and PHYLLIS F. SCHELL, Respondents, v. CITY OF JEFFERSON, MISSOURI, a Municipal Corporation, Appellant, No. 41888—235 S. W. (2d) 351.

Court en Banc, December 11, 1950.

Rehearing Denied January 8, 1951.

*D. F. Calfee* and *Paul Ewing Allen* for appellant.

*Lewis H. Cook, Lauf & Bond, H. P. Lauf* and *John O. Bond* for respondents.

[352] TIPTON, J.—This is an action to quiet title instituted by respondents against the appellant city. The land in question is "Parts of inlots Nos. 295 and 296 in the City of Jefferson, Missouri." The trial court found the issue in favor of respondents and appellant has duly appealed.

This is the second appeal in this case. Our opinion in the first appeal is found in 212 S. W. 2d 430. We reversed and remanded a judgment in favor of respondents because the trial court refused to admit in evidence an old map found on the walls in the office of the recorder of deeds of Cole County. This map was referred to as exhibit D in the first trial and as exhibit G in the second trial. A metes and bounds description of the land in question and the citation of early statutes dealing with the platting and selling of the various lots in Jefferson City will be found in our first opinion.

Very briefly reviewing these acts we find that the Act of Congress authorizing Missouri to become a state provided that four entire

sections of land be granted to the state for the purpose of fixing its seat of government. Various acts of the legislature provided for the selection of these sections; that the city "be called 'city of Jefferson' ''; that the governor appoint a surveyor to lay out the city; that it should contain at least one thousand lots with the principal street between 100 and 120 feet wide and the other streets not less than 80 feet wide, with alleys 20 feet wide, and the remainder of the tract of land to be laid out into lots of five, ten, twenty and forty acres. The commissioners were appointed according to these statutes and made their report to the legislature. It directed by joint resolutions that the report and other documents on the subject be deposited in the office of the secretary of state for safekeeping. It also directed the secretary of state "to cause the plan of the city of Jefferson to be made out on parchment, and deposited in his office, * * * and also to furnish the trustees of the city of Jefferson, as soon as may be, with a copy of the plan of said city * * *.''

Statutes were also enacted that empowered the trustees to sell these lots and to incorporate the city. The commissioners of the permanent seat of government deeded inlot No. 295 on December 11, 1841, and inlot No. 296 on December 4, 1837. The various conveyances from the original deed until the year 1898 conveyed these two lots only by numbers. After that date the description in the deeds then added the metes and bounds.

The evidence in the second trial is considerably different from that in the first trial as will be shown later.

The appellant in its brief states, "The heart of this case, the vital question to be determined, is: Does the bed and banks of Weir's (Wares) Creek belong to the City of Jefferson, and are Inlots 295 and 296 Fractional Inlots lying wholly North of Weir's (Wares) Creek, or is the City of Jefferson without any title whatever to said creek, and do said inlots extend on the South to the North line of High Street thus entitling plaintiffs to all or part of the bed and banks of said creek at that location?" In their brief respondents admit that this is "the issue before the court.''

As originally platted each inlot in Jefferson City is 104 feet 4 ½ inches by 198 feet [353] 9 inches. Each block is square and contains four acres with a twenty foot alley and eight inlots. Each block from property line to property line is 417½ feet. Each street is 80 feet wide except Broadway, which is 100 feet wide. Each outlot was exactly five, ten, twenty or forty acres in area. There were some fractional inlots platted.

If inlots Nos. 295 and 296 are not fractional lots then they would be 104 feet 4½ inches by 198 feet 9 inches, and the south part of these lots would extend into Weir's Creek. The original deeds describe them as inlots 295 and 296. There is nothing in these deeds that would indicate they are fractional lots.

The appellant's claim to the abutting creek bank and bed of these two lots is based upon exhibit G. This exhibit is the map which we ruled in the first appeal should have been admitted in evidence. This exhibit has the name of Erich Plump and the year 1849 on it. The evidence showed that it was framed and under glass and had been hanging on the walls of the office of the recorder of deeds of Cole County for at least twenty six years. There are inferences that can be drawn that it has been there a much longer time. This plat has never been inventoried as an official document or recorded. There are no measurements on it. It was probably drawn by Erich Plump who was a member of the board of aldermen of Jefferson City in 1846 and city assessor in 1849.

Under section 114b of the General Code of Civil Procedure the appellant requested the trial court to file an opinion containing the grounds for its decision. The essential parts of the trial court's opinion are as follows:

"In my judgment, the decision in this case hinges on the authenticity of this map.

"The Supreme Court did not reverse my decision because it disagreed with my criticisms of this map set forth in my opinion in the first case. It reversed my decision because I excluded the map; and this cause was returned to this Court so that *both sides* might have an opportunity to present evidence for and against authenticity. The criticisms of this map expressed by me in my original opinion still stand and still state my views. I bow to the decision of the Supreme Court that the unilateral evidence supporting the map at the first trial required its admission in evidence and consideration by me. I am ready to agree with the Court, if that is required, that the map and evidence supporting it at the first trial warranted and required a finding for the city. However, I am not prepared to rule that virtually the same supporting evidence, introduced at this trial by the city, and the attenuated inferences the Supreme Court held allowable from that evidence, are sufficient to warrant and require a ruling in this case for the city in the face of the countervailing evidence of the plaintiffs.

"I reiterate everything I said in my original opinion in criticism of this map and of the city's evidence, and apply these criticisms in this case. I direct attention of the parties to the testimony of F. E. Ross, Surveyor, which in my opinion easily counter-balances and destroys the validity of any reasonable theory that this map is a true copy of a proper ancient document, the original having been destroyed, and that I must be governed by it in deciding the title to the property in suit. I do not deem it necessary to recapitulate the testimony of Mr. Ross. The parties are as familiar with it as I am. I think it suffices to say that I do not regard the testimony of Richard D. Fowler, the City Engineer, as impairing the force either of the

Ross testimony or my criticisms of the map. On this record, I regard the map as unreliable and as an improper instrument for carving out real estate areas in this city. It is the only evidence I have from the city to justify its claim of title. Accordingly, I rule that the city, by producing no other evidence, leaves itself, as it began the case, a stranger to the title, and that the plaintiffs, having made a *prima facie* case by showing possession, should be adjudged the title to the land in controversy.''

Our review is de novo on the whole record ''as in suits of an equitable nature.'' Laws 1943, p. 387, sec. 114, Mo. R. S. A., sec. 847.114. However, we must give due deference to the findings of the trial court. With [354] these rules of law in mind, we are of the opinion that the trial court's findings were correct.

The lines of exhibit G that mark the boundaries of inlots 295 and 296 do not make a true rectangle because the southern line of these two lots does not extend into Weir's Creek. It follows the bank of the creek and that is the reason the city contends that it owns the northern bank and the bed of Weir's Creek.

In our opinion on the first appeal, in speaking of this map, we said, ''However, it was shown to be drawn to scale and to be an accurate plat of the City as it now exists and has existed.'' The evidence in this record is to the contrary. There is nothing on this exhibit that shows how many feet are represented to the inch, however, the witnesses on both sides used 400 feet to the inch in scaling the plat. Using this scale the outlots which are mostly in the southern and western part of the original city area scale out as they should; this is true even though the map shows more wear there than on the other parts of it. The inlots scale out to less width than they actually are. They scale out 100 feet instead of 104 feet 4½ inches.

There was testimony that the Government survey showed that the west side of the original part of the city was 14,632.2 feet long, but scaled out on exhibit G it was only 13,100 feet, making the map 1532.2 feet short of the Government survey. On the southern line the Government survey shows the distance to be 9,622.8 feet long. Scaled on this map the distance is 8,600 feet, again a shortage of 1,022.8 feet. According to the Government survey the east line is 9,566.7 feet but scaled on this map it is only 8,700 feet, a discrepancy of 866.7 feet. High Street is actually 80 feet wide, but scaled on this map it is 85 feet wide east of Jefferson, 90 feet wide west of Monroe. Broadway is actually 100 feet wide, but scaled on this map it is 120 feet wide north of Elm, 115 feet wide north of Miller and 120 feet wide south of that street. North of McCarty it is 115 feet wide and 120 feet wide south. According to this map the main business buildings of the city are from 5 to 10 feet out in High Street.

502

The evidence shows that in the office of the secretary of state all the Land Plat Books from Volume One dated 1817 to date are intact and that there are no missing records caused by the burning of, the Capitol in 1837 or 1911. The Government survey and field notes of the land given for the establishment of the permanent seat of government on which Jefferson City is located are in the files and records and if the plat had been made and recorded it could have been found. But there is no record that one was filed nor was one found. It could have been possible that such a plat was left in that office but there was no record that would so indicate that fact.

It is true abstractors and surveyors have used this map but usually only to locate various lots and not for determining the dimensions of lots.

There was evidence that old maps would shrink on account of age and atmospheric conditions but one witness testified that they shrink uniformly. That is what the trial court evidently found. Since the oral evidence was disputed we must defer to his findings.

The evidence shows that when the city was originally platted there were Government markers presumably placed at each block. These markers were of stone about six inches square and eighteen inches long. Many have now been removed but there are several only a few blocks from the property in question.

County Engineer and Surveyor Ross has made a new survey of this property since the first trial. This time he started from a known Government corner.

There were other maps introduced by appellant, for instance, some maps belonging to the Missouri Pacific Railroad Company. Its oldest map was a tracing, and it is a fair inference that it was traced from exhibit G. This is also true of a map called the Harding map.

Respondents introduced in evidence an old atlas referred to as the Cole County Atlas. It has been in the county surveyor's office and in the recorder's office for at least 26 years and is used by abstractors, surveyors and others for reference, the same [355] as exhibit G. Like exhibit G, it does not purport to be a copy of the official original plat of Jefferson City but it does scale to the inlots, outlots and streets as they actually are. This atlas shows that inlots 295 and 296 are full inlots. In other words, the lines showing these lots cross Weir's Creek.

The evidence in the second trial clearly shows that exhibit G is not ''drawn to scale'' and ''an accurate plat of the city as it now exists and has existed'' as was shown in the first trial. New evidence was introduced in the second trial; therefore, the appellant's contention that our opinion in the first trial is the law of the case is overruled. State ex rel. Bush v. Sturgis, 281 Mo. 598, 221 S. W. 91, 9 A. L. R. 1315.

■ 503

■ The respondents have been in possession, used and improved the land in dispute since 1944. Their deed and the deeds of their predecessors in title since 1898 included the land in dispute by metes and bounds. The deeds from the state described the lots as inlots 295 and 296. They were not described as fractional lots. In 1928 the appellant obtained a temporary injunction in the circuit court to restrain the then owner of this land from erecting a retaining wall on the land in dispute. It alleged the defendant was the owner of the land by the metes and bounds description referred to above, but it contended that the retaining wall would be dangerous to citizens and property. It was dismissed by appellant and appellant paid defendant's attorney's fee. This is shown only for the purpose of showing that appellant did not then claim title to the land and, also, that respondents' predecessor in title was in possession of this land. There is no evidence that would justify a finding that appellant had any record title to this land or was in possession. The evidence justifies the finding of the trial court that the appellant is a stranger to the title.

"A suit to quiet title is a special statutory action to adjudge the respective 'estate, title and interest' of several claimants to land. [R. S. 1909, sec. 2535; Gage v. Cantwell, 191 Mo. 698; Graton v. Lumber Co., 189 Mo. 322; Huff v. Land & Imp. Co., 157 Mo. 65.]

"A fundamental difference between such action and one in ejectment is, that it is never necessary to the former that the title of the plaintiff should be good against the world but only against the defendant; while in ejectment (in the absence of common ancestor) plaintiff can only get possession by showing an estate in fee." Maynor v. Tyler Land & Timber Co., 236 Mo. 722, l. c. 728, 139 S. W. 393.

We find that the judgment of the trial court was for the right party. It therefore follows that it should be affirmed. It is so ordered. All concur.